UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re Barry J. Killian,<br><br>　　　　　Debtor. | Bankruptcy No. 07-B-10318<br>Adversary No.<br>Chapter 7<br>Judge Manuel Barbosa |

### MEMORANDUM OPINION

This matter comes before the Court on a motion by creditor UBS Financial Services Inc. ("UBS") to dismiss the Debtor's case under 11 U.S.C. § 707(a) and (b). For the reasons set forth herein, the Court will deny UBS's motion.

### JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

### FACTS AND BACKGROUND

The following facts and procedural history are taken from UBS's motion to dismiss, reply in support of motion to dismiss and response to Debtor's supplemental reply to motion to dismiss, the Debtor's response to motion to dismiss and supplemental reply to motion to dismiss, and from the testimony and evidence presented and admitted at the evidentiary hearing conducted on October 1, 2009.

The Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on June 8, 2007. In the Debtor's schedules to his bankruptcy petition, he listed four creditors as of the date of his petition: Mortgage Questions.com, who he listed with a $660,000 secured claim on his home which he valued at $800,000, UBS, with a $687,254.51 unsecured claim, Wachovia Securities ("Wachovia"), with a $578,000 unsecured claim, and Jennifer Kozielski, with a $9,150 unsecured claim for arbitration fees. The Debtor worked at UBS from 2001 to 2005 as a financial advisor. In May 2005, he left UBS to join Wachovia as a financial advisor and senior vice president. He is currently still employed by Wachovia, as a manager, but is on a severance program and will lose his job soon.[1]

The Debtor worked at Merrill Lynch prior to joining UBS. When he joined UBS, as part of the incentive package they offered him, in addition to his regular salary, UBS offered to pay what the parties have referred to as a "transition bonus" or an "employee forgivable loan" at the time he started working for UBS. UBS gave the Debtor a check in the amount of $1,959,444.00 and the Debtor signed an "Employee Forgivable Letter of Understanding" and a separate Promissory Note. The promissory note provided that no interest was due or payable on the principal amount except after certain events of default. The promissory note also provided that UBS would forgive one-fifth of the original principal amount in May of each of 2002, 2003, 2004, 2005 and 2006, if on such date the Debtor was a full-time employee of UBS and the promissory note had not been accelerated due to a default. The promissory note also provided that the entire principal amount would be forgiven upon the death or certain disabilities of the Debtor. Other than after acceleration, the promissory

---

[1] Wachovia was acquired by Wells Fargo at the end of 2008, but for convenience, this Opinion will refer to the successor in interest Wells Fargo as "Wachovia."

note did not provide for any schedule of payments, except to pay certain withholding taxes. The promissory note provided that the debt would automatically become due and payable if the Debtor's employment at UBS was terminated, either voluntarily or involuntarily, for any reason other than disability or death. UBS also had the right to accelerate the debt if the Debtor lost his NASD dealer's license, if the Debtor filed for bankruptcy or if the Debtor defaulted in payment on the note. The promissory note also had provisions forbidding the Debtor from contacting UBS clients after his termination at any time the debt under the promissory note was still outstanding. The promissory note also provided for consequential damages, including damages incurred in connection with the hiring and employment of the Debtor. In June 2004, the remaining principal amount was $783,777.60. Pursuant to an amendment in June 2004, the forgiveness schedule was amended to forgive the remaining principal in equal installments in May of each of 2005, 2006, 2007 and 2008. Therefore, when the Debtor resigned from UBS in May 2005, the outstanding principal on the promissory note was $587,833.20. The Debtor did not repay this amount, and UBS filed a claim against him with the arbitration facility of the National Association of Securities Dealers ("NASD"). On March 16, 2007, the NASD arbitrator granted an award in favor of UBS in the amount of $687,254.51, which included interest and fees. On April 19, 2007, the NASD arbitrator informed the Debtor, that pursuant to NASD rules, his NASD membership would be suspended on May 10, 2007 unless, prior to that date, he had paid the award in full, entered into a written settlement agreement with UBS, successfully modified or vacated the award, or "filed for bankruptcy protection and the award has not been deemed by a Federal court to be non-dischargeable." The Debtor made attempts to negotiate a settlement with UBS, but when the negotiations failed the Debtor filed his

bankruptcy petition to avoid losing his license.

When the Debtor joined Wachovia in May 2005, they offered him a similar incentive as UBS's "transition bonus." The Debtor testified that this bonus was, at least in part, consideration for bringing a book of business over to Wachovia, and the offer summary made reference to the fact that the bonus was based on "100% of [his] pre-hire trailing twelve months of production" and based on his pre-hire assets. The Debtor signed a promissory note for $574,092 on May 27, 2005, and Wachovia advanced him such funds. The promissory note provided for interest of 4.28% per annum. It provided for repayment by monthly payments of $10,048.82 of principal and interest for 64 months beginning January 1, 2006. As part of their employment offer, Wachovia agreed to pay a "transitional bonus" of $574,092 plus 4.405% per annum interest, to be paid in monthly installments of $10,048.82 for 64 months, commencing January 2006. In other words, the payments of the "transitional bonus" were identical to the amounts due and owing under the promissory note. Moreover, these payments were simply deducted from his paycheck. Thus, while "monthly payments" of $10,048.82 were included on the Debtor's pay stubs, he did not in fact receive the money, which was simply deducted from the amounts owing on the promissory note. The bonus payments were not included as compensation for any Wachovia employee benefit plan. Under the employment terms, the bonus payments would cease if the Debtor was no longer employed by Wachovia, other than termination because of death or total disability, or if the Debtor defaulted under the terms of any promissory note or other obligations to Wachovia. Upon death or total disability, Wachovia would pay the remaining bonus payments as a lump sum. The promissory note included as events of default: the failure to make payments on the note, ceasing employment with

Wachovia for any reason, or the commencement of any proceeding under bankruptcy law. Therefore, with the filing of his bankruptcy petition, the Debtor's right to bonus payments from Wachovia ceased, and the outstanding principal amount of $578,000 became due and payable.

The $1.9 million the Debtor received from UBS in 2001 was placed into a personal securities account. Over the years, he borrowed against the securities in the account to pay personal bills, and used some of the funds to repay those loans. However, he lost the bulk of the money because of the securities investments through the account. For example, he lost $1.667 million in the stock market between 2001 and 2002. He did not use the $578,000 he received from Wachovia in May 2005 to repay the UBS loan. It is not entirely clear how he spent the Wachovia money, but presumably he also lost it on investments or used it on personal expenses. The Debtor listed his monthly gross income in both his Schedule I and his Form 22A as $9,596 per month.[2] He listed his allowable expenses under IRS local standards as $8,466, so when added with his $4,200 mortgage payment, he passed the means test. His amended Schedule J listed his actual monthly expenses as $10,368 per month.

## DISCUSSION

11 U.S.C. § 707(b)(1) gives the Court the power, after notice and a hearing, upon a motion by any party in interest, to dismiss a case filed by an individual debtor under Chapter 7 whose debts are primarily consumer debts if the Court finds "that the granting of relief would be an abuse of the provisions of [Chapter 7]." Section 707(b)(2) sets out a means test, which, if failed, creates a

---

[2]The Debtor initially listed his monthly gross income as $8,333, but he subsequently filed amended schedules increasing the amount to $9,596. The Debtor also initially contended that his debts were not primarily consumer debts, but subsequently conceded that his debts were primarily consumer, and filed an amended Form 22A.

presumption of abuse. The means test looks at the Debtor's "current monthly income" minus certain allowed expenses, most of which are by reference to the Internal Revenue Service's National Standards and Local Standards, and if such net amount is greater than a certain monetary amount, results in a presumption of abuse. However, Section 707(b)(2) only creates a <u>presumption</u>, and is not the only way that abuse may be proved. Section 707(b)(3) states that:

> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider--
> (A) whether the debtor filed the petition in bad faith; or
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 <u>U.S.C.</u> § 707(b)(3) (2009).

UBS makes two arguments that the Debtor's case should be dismissed. First, it contends that the Debtor should have included the monthly "transitional bonus" payments of $10,048.82 in his calculation of "current monthly income," and that if they were included, the Debtor would have failed the means test under Section 707(b)(2), creating a presumption of abuse. Second, it contends that the Debtor's case should be dismissed for cause under Section 707(a) or (b)(3) under the "totality of the circumstances" test, because the Debtor only has three unsecured creditors, of which UBS is the largest, and that, if the bankruptcy case proceeded, UBS would be the only creditor not to be "made whole." UBS argues that the Debtor is attempting to use the bankruptcy process against a single disfavored creditor to whom he has the ability to pay.

### **The Wachovia Transitional Bonus Payments**

11 <u>U.S.C.</u> § 101(10A) defines "current monthly income" ("CMI") as "the average monthly

income from all sources that the debtor receives . . . without regard to whether such income is taxable income, derived during the 6-month period ending on" the last day of the calendar month preceding the petition date, with certain additions and exclusions. Neither the term "income" nor the term "monthly income" is defined in the Bankruptcy Code. UBS argues that the Court should interpret the meaning of the word "income" in the definition of CMI to refer to the term "gross income" under the Internal Revenue Code (the "Tax Code").

The Seventh Circuit Court of Appeals has indicated that, at least in some instances, it is appropriate to look to definitions in the Tax Code when interpreting undefined terms in the Bankruptcy Code. In In re Wagner, the court held that the use of the term "gross income" in the definition of "farmer" in 11 U.S.C. § 101(17)[3] should be deemed to incorporate the definition of gross income in federal income tax law. 808 F.2d 542, 549 (7th Cir. 1986). The court found that the definition of "farmer" provided for a mechanical test and that using the tax law definition promoted certainty while "little would be gained by devoting substantial judicial resources to fine-tuning the concept of 'gross income.'" Id. at 547. However, the Bankruptcy Code provision at issue in Wagner used the term "gross income," which is expressly defined in the Tax Code, while the term "income" at issue here is not. Also, from the plain face of the definition of CMI, it is clear that Congress did not intend a whole-hearted importation of Tax Code definitions, since the definition of "current monthly income" in the Bankruptcy Code refers to average monthly income "without regard to whether such income is taxable income." 11 U.S.C. § 101(10A) (2009). The Bankruptcy Court for the Northern District of Oklahoma has held that the Tax Code definition of "gross income" should

---

[3]Subsequently redesignated by amendments as 11 U.S.C. § 101(20).

apply to debtors' disclosures of "income" in their statement of financial affairs and Schedule I. Cadle Co. v. King (In re King), 272 B.R. 281, 293 (Bankr. N.D. Okla. 2002). But, that case was decided before the 2005 amendments to the Bankruptcy Code ("BAPCPA") which added the definition of CMI and added the means test in Section 707(b). In contrast, courts interpreting the definition of CMI have rejected any argument that courts must adopt the Tax Code definition of "gross income" to interpret the term "income" used in the definition of CMI. Thus, the Ninth Circuit Court of Appeals has stated that the phrase "without regard to whether such income is taxable income" used in the definition of CMI "reflects Congress' judgment that the Internal Revenue Code's method of determining taxable income does not apply to the Bankruptcy Code's calculation of CMI." Blausey v. U.S. Trustee, 552 F.3d 1124, 1132 (9th Cir. Jan. 23, 2009). The court further noted that, when Congress wants to define a term in the Bankruptcy Code by reference to the Tax Code, "it clearly knows how to do so," as it did when it imported IRS local and national standards for expenses into the means test. Id. at 1133; see also Simon v. Zittel, 2008 WL 750346, at *1 (Bankr. S.D. Ill. 2008) (finding there is no indication in the Bankruptcy Code that the Tax Code's definition of "gross income" should be adopted to define "income" in the definition of CMI); In re Cram, 414 B.R. 674, 681 (Bankr. D. Idaho April 24, 2009) (adopting the reasoning used in Simon); Zahn v. Fink (In re Zahn), 391 B.R. 840, 845 (8th Cir. BAP 2008) (finding that the fact that funds were excluded from federal income tax was irrelevant to determination of whether they constituted income under the Bankruptcy Code's definition of CMI).

Instead, the court in Blausey looked to the common definition of "income" and the purposes of the BAPCPA. Black's Law Dictionary defines "income" as "the money or other form of payment

that one receives, usu[ally] periodically, from employment, investments, royalties, gifts, and the like." Blausey at 1133 (citing Black's Law Dictionary, 8th ed. 778 (2004)). The court further noted that the heart of BAPCPA's consumer bankruptcy reforms consisted of an income/expense screening method which was intended "to ensure that debtors repay creditors the maximum they can afford" and to "help the courts determine who can and who cannot repay their debts, and perhaps most importantly, how much they can afford to pay." Blausey at 1133 (internal citations omitted).

Neither party disputes the fact that the Debtor received income in respect of the "transition bonus" from Wachovia. The only question is whether the Debtor received the income when he received the $574,092 check from Wachovia in May 2005 or whether he received the income monthly when $10,048.82 was given or applied by Wachovia to reduce the amount outstanding under the promissory note. The Court finds that, although the amounts funded in May 2005 were characterized by UBS as a "loan," for purposes of Section 101(10A), they were an advance of income.

As previously mentioned, the Court is not bound by the Tax Code's definition of "gross income," but the Court is influenced by the fact that the advance would likely be characterized as an advance of income under tax law. Although advances under true loans are not taxable as income, see Saunders v. Commissioner, 720 F.2d 871, 873 (5th Cir. 1983), a court can look beyond the labels that parties use, and instead look to the underlying substance of a transaction to determine whether a purported loan is in fact something else. To determine whether a transaction is a true loan, Courts have examined factors such as "(1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was

established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan," though such factors are non-exclusive and no single factor is dispositive. Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000). While bona fide loans from employers to employees certainly exist, the employment relationship makes it possible, or even suspicious, that a so-called loan from an employer to an employee is simply a bonus or an advance of wages, which should be treated as income. This is particularly true where, as here, the "loan" is part of the employment offer package, in a field where signing bonuses are common,[4] and where the bonus is at least partially in consideration for clients or assets brought over to the employer. Although the parties documented the "loan" in a separate document than the employment offer, it is clear that they were intended as part of a single transaction. Thus, the payment schedule under the promissory note exactly matches the "transition bonus" payments under the employment offer. There is also a provision allowing the Debtor to take approved periods of leave that perfectly matches between the two documents, so that, during such period, the "bonus payments" will stop but so will the required payments under the promissory note. The practical effect, therefore, is that no transfers of actual money will occur (unless the Debtor's employment ceases or another event of default occurs), but rather the "payments of the transition bonus" will simply be offset by the "payments on the loan." In other words, the economic effect is exactly the same as periodic and scheduled forgiveness of the outstanding "debt."

---

[4]In fact, UBS's claim against the Debtor arises out of an almost identical compensation package they offered the Debtor when they hired him.

The reason that loan advances are not normally treated as income under tax law is that the money received is offset by the obligation to repay the funds that is created by the loan. Comm'r v. Tufts, 461 U.S. 300, 307 (1983). Therefore, one of the main factors that courts look at to determine whether an advance is a loan or income for tax purposes is whether, when the funds were advanced, the parties actually intended repayment. Welch, 204 F.3d at 1230. Therefore, the obligation to repay must be unconditional and not contingent upon a future event. Morgan v. Comm'r, 73 T.C.M. (CCH) 2313; 1997 WL 110023, at *2 (1997) (citing United States v. Henderson, 375 F.2d 36, 39-40 (5th Cir. 1967); Bouchard v. Comm'r, 229 F.2d 703 (7th Cir. 1956) (aff'g. T.C. Memo. 1954-243). The fact that the bonus payments are accelerated, and thus the debt is essentially forgiven, upon the Debtor's death or total disability therefore tends to indicate the transaction was not a loan. Courts have also been skeptical of purported loans where it is clear that the repayments are to be made through the provision of future service rather than in payments of money. As the U.S. Tax Court has stated, "an intent to repay a purported loan by the performance of services in the future does not result in the exclusion of the underlying funds from the recipient's income. In such a case, the purported loan proceeds are nothing more than an advance salary or other payment for services which are includable in the recipient's income when received." Morgan at *2 (internal citations omitted). Even though an employee may have to repay the loan with money if he ceases employment, the expectation is that the "loan" would be "repaid" through future service. Therefore, because the debtor's "primary obligation was to work," and the "obligation to repay the remaining amount was secondary [and] would only have arisen if the petitioner had failed to complete his primary obligation," the amount received is income and not a loan. McCormack v. Commissioner,

52 T.C.M. (CCH) 1321; 1987 WL 40089 (1987). The obligation to repay the loan if the employee ceases working for the employer is therefore more like liquidated damages for breach of the employment contract than a debt or loan obligation. Therefore, it would appear that even under tax law, the advance would have constituted "income" at the time of the advance in May 2005.[5] Moreover, since the purpose of the means test is to identify the Debtor's sources of income in order to estimate how much income he receives and therefore how much he can afford to pay, it seems more appropriate to look to the time that he actually received the funds than the time the 'repayment obligation' was reduced. Here, the funds were received two years before the bankruptcy petition, and there is no indication that the transaction was structured to manipulate the means test. Therefore, it was not improper for the Debtor to exclude the periodic "transition bonus" payments which were reported on his pay stubs from his Form 22A or his calculation of income for the means test. Accordingly, there is no presumption of abuse under Section 707(b)(2).

### Abuse under the Totality of the Circumstances

The Seventh Circuit Court of Appeals has stated that failing the means test "simply means that the debtor's petition is not <u>presumed</u> abusive . . . the UST can still request dismissal . . . under section 707(b)(3), either for bad faith or based on the totality of circumstances (which can take into consideration a debtor's actual income and expenses)." <u>Ross-Tousey v. Neary (In re Ross-Tousey)</u>, 549 F.3d 1148, 1161-62 (7th Cir. Dec. 17, 2008). Under the totality of the circumstances test, "a debtor's ability to pay may be the most relevant factor, but the Court must also consider: (1) whether

---

[5]For tax purposes, "'advance payments' must generally be included in gross income by the recipient when received, even if the recipient uses an accrual basis of accounting for tax purposes." <u>Indianapolis Power & Light Co. v. Commissioner</u>, 857 F.2d 1162, 1166 (7th Cir. 1988).

the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment; (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay; (3) whether the debtor's proposed family budget is excessive or unreasonable; and (4) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition." In re Cutler, 2009 WL 2044378, at *3 (Bankr. S.D. Ind. July 9, 2009) (citing In re Green, 934 F.2d 568, 572 (4th Cir.1991)).

UBS argues that, notwithstanding the means test, the Debtor has an ability to repay his debts, and that he only filed for bankruptcy in order to frustrate UBS, and that therefore, his case should be dismissed under the totality of the circumstances test. With respect to his ability to pay, UBS points to the Debtor's $4,200 payments on his home mortgage, a property for which he apparently has $140,000 of equity, and his $2,150 payments of alimony, maintenance and support as evidence of a "lavish" lifestyle. However, there is no indication that the house was purchased or the support obligations incurred at any time near the filing of bankruptcy or at a time the Debtor had financial difficulties. Moreover, the docket reflects that an order lifting the stay on the Debtor's house was granted on November 15, 2007, and the Debtor testified that his mortgage lender was in the process of foreclosing on the property. To the extent there is any equity in the property, the excess proceeds in excess of any homestead exemption would be available to pay unsecured creditors, including UBS.

UBS also points to a $214,000 IRA that the Debtor scheduled, but claimed as exempt. The Debtor cites In re Collins, 250 B.R. 645, 654 (Bankr. N.D. Ill. 2000), for the proposition that a court can consider exempt assets when making a determination that a debtor has the ability to pay, which

is a factor under the totality of circumstances test. However, Collins was a pre-BAPCPA case, and while a court may still look to actual ability to pay, the means test limits its discretion somewhat. Also, the Debtor has testified that, due to the current recession, his IRA is only worth about $40,000 today, and would be further decreased substantially by penalties if he were to liquidate it. Thus, while a court might be able to consider exempt assets as a factor, the IRA account is not unusually large, and there is no indication that he made contributions to the account to manipulate the means test or abuse the bankruptcy process. Therefore, without more, the Court will not find that the Debtor's petition was in bad faith or abusive.

UBS also argues that it is essentially the only creditor that will "not be made whole" if the Debtor is allowed to proceed with his case. It is true that his mortgage lender will be made whole by foreclosing on the house, but that is the bargain it made in lending the money. If UBS wanted security, it should have bargained for a security interest in property when it entered into its arrangement with the Debtor. UBS argues that Wachovia is made whole because it no longer has to make transition bonus payments to the Debtor. However, as discussed above, Wachovia was never really making payments to the Debtor, but instead was forgiving the repayment obligation over time. Its claim against the Debtor for the remaining repayment obligation is unsecured, and therefore Wachovia is in the same position as UBS. In fact, since their claims are of similar size and are both based on employment incentive "loans," it is difficult to understand how UBS can argue that Wachovia is in a better position.

Finally, UBS argues that the Debtor's intent in filing bankruptcy was to frustrate UBS's ability to enforce its arbitration award against the Debtor. However, to the extent the arbitration

award is simply a claim against the Debtor, UBS is not in a different position from any other creditor, and debtors normally have a right to seek protection under the bankruptcy provisions. UBS will be paid its share on the claim from any available assets of the estate. It is true that one of the motivations of the Debtor in filing his petition was to maintain his registration with NASD. But, it is usually the case that debtors file for bankruptcy to seek protection from creditors' collection or enforcement actions. Moreover, since, as discussed above, the Debtor is unable to pay his debts even with his current ability to work, it would hardly be equitable to deny him protection from his creditors because of his income but then effectively cut off his ability to work. Therefore, the Court finds that UBS has not demonstrated cause to dismiss under either Section 707(a) or (b).

## CONCLUSION

For the foregoing reasons, UBS's motion to dismiss is DENIED.

THEREFORE, IT IS ORDERED that

the foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021 giving effect to the determinations reached herein.

DATE: November 12, 2009

The Honorable Manuel Barbosa
United States Bankruptcy Judge